IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) Cr. No. 20-01370-KWR |
| vs. | ) |
| **JULIAN GARCIA III**, | ) |
| Defendant. | ) |

## UNITED STATES' OPPOSED TENTH MOTION IN LIMINE
## FOR SWORN TESTIMONY VIA VIDEO CONFERENCE

The United States of America moves this Court to permit sworn testimony via video conference at trial from witness Jose Bulow, an emergency medical technician-I (EMT-I) who provided care to Defendant during a brief ambulance transport from the scene of the assault to Presbyterian Espanola Hospital. EMT-I Bulow is also a deployed member of the New Mexico Air National Guard attached to G Company, 1-168th General Support Aviation Battalion, Combined Joint Task Force Phoenix, forward mobilized in support of Operation Inherent Resolve in and around Iraq.

In a more perfect world, this motion would be unnecessary. But, due to the change of defense counsel in the past week, the lack of a present stipulation as to this video testimony, the present motions deadline imposed by the Court, and the ongoing COVID-19 pandemic, this motion is necessary. The United States should be permitted to present video evidence from its deployed, out-of-country witness on the scheduled trial date of September 13, 2021.[1]

---

[1] It should be noted that per the direction of this Court, and pursuant to the United States' representations in the most recent Joint Motion to Continue Trial (Doc. 52), the United States has

Defendant was contacted for his position on this motion and did not provide a response. The United States assumes that Defendant opposes the instant motion.

**1) Summary of Facts**

On July 4, 2019, the Defendant struck Jane Doe with an off-highway motor vehicle (hereinafter referred to as an ATV, or all-terrain vehicle) on a roadway within the exterior boundaries of the Ohkay Owingeh Pueblo Indian Reservation, Indian Country, in the District of New Mexico. The indictment alleges that Defendant was under the influence of alcohol and driving the ATV on a paved street or highway, both acts being contrary to state law. The incident occurred at approximately 9:25 p.m. near the intersection of State Road 291 (SR291) and North McCurdy Road, Ohkay Owingeh, New Mexico. Jane Doe was crossing the road from the south to north side on foot after sunset when Defendant, driving an ATV westbound on SR291 at a high speed and with the headlights off, struck Jane Doe and threw her sixty-nine (69) feet from the impact point.

Witnesses observed Defendant consuming alcohol and driving the ATV recklessly along the road before he hit Jane Doe. Both Jane Doe and Defendant were transported by ambulance from the scene of the crash to Presbyterian Española Hospital for treatment.

EMT-I Bulow provided treatment to Defendant in the ambulance enroute to the local hospital. On that evening, EMT-I Bulow was on duty with Espanola Emergency Medical Service. He was with his partner near the Ohkay Owingeh Casino, where they and other first responders had been stationed for the Independence Day fireworks display. After about the

---

initiated the process to obtain Mr. Bulow's physical presence at trial. The United States has every intention of completing this process and securing Mr. Bulow's attendance if this motion is denied.

second or third firework, they received a call to provide emergency services. When they received the call, they were parked approximately one-quarter (1/4) of a mile away from the scene. When they arrived at the scene, EMT-I Bulow's partner attended to Jane Doe and EMT-I Bulow attended to Defendant.

EMT-I Bulow found Defendant lying under an SUV where Defendant was going in and out of consciousness. With the assistance of a firefighter, they put a C-Spine collar on Defendant and loaded him on to a stretcher, then loaded him into the ambulance for transport to the hospital.

During the transport, EMT-I Bulow noted that Defendant was in pain and noted the smell of alcohol on Defendant's breath. For purposes of medical care, EMT-I Bulow asked Defendant if he had used any drugs or alcohol, to which Defendant answered: "I had a few," which EMT-I Bulow interpreted to mean that Defendant had consumed alcohol. Because he learned that Defendant had used alcohol and because EMT-I Bulow observed Defendant drifting in and out of consciousness, EMT-I Bullow followed protocol and did not provide the patient with pain-management narcotics. This protocol is in place to ensure that there are no mal-effects of alcohol-drug interactions during transport. Through other interactions and observations, EMT-I Bulow assessed that Defendant was heavily intoxicated.

At the hospital, Defendant admitted to a New Mexico State Police Officer that he had been drinking earlier in the evening and that he was the driver of the ATV that struck Jane Doe. The hospital treated Defendant for injuries and the treating doctor also assessed that Defendant was heavily intoxicated.

EMT-I Bulow's observations provide valuable evidentiary support for the United States' allegations and contradicts Defendant's self-serving statements to insurance adjustors months after the assault.

As previously stated, EMT-I Bulow is a deployed member of the New Mexico Air National Guard forward mobilized in support of Operation Inherent Resolve in and around Iraq. He is one of only three flight paramedics in his unit providing emergency medical evacuation services to an area of operations larger than his unit and their personnel levels are structured to support. Importantly, the United States anticipates that EMT-I Bulow's presence will require eleven (11) days away from the unit—three (3) days of travel on either side and five (5) days in New Mexico to be present during trial. Additionally, service members traveling from the United States to forward-deployed locations are subject to Restrictions of Movement (ROM) for fourteen (14) days upon arrival to ensure they are not sick with or carrying COVID-19. Thus, to secure EMT-I Bulow's presence for trial, he would be absent from his critical life-saving mission for twenty-five (25) days. Such an absence will severely impact the medical evacuation mission for Operation Inherent Resolve.

At trial, the United States does not anticipate that EMT-I Bulow will testify for longer than 30 minutes. Conversely, the United States' medical expert, Dr. Jordan Treworgy, will testify in person about the provision of medical care in the hospital emergency department. Dr. Treworgy's testimony, though substantively different and more expansive, will corroborate EMT-I Bulow's account. Therefore, compelling EMT-I Bulow, who is deployed in Iraq, to travel for his limited testimony would be obtuse, unnecessary, and could potentially degrade a life-saving function in a combat zone.

## 2) **Applicable Law**

"The right to confront and to cross-examine is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." *Chambers v. Miss.*, 410 U.S. 284, 295 (1973). While "the Confrontation Clause reflects a preference for face-to-face confrontation at trial, that preference *must occasionally give way to considerations of public policy and the necessities of the case.*" *Maryland v. Craig*, 497 U.S. 836, 849 (1990) (emphasis in the original) (internal citations and quotations omitted).

In *Craig*, the state of Maryland invoked a statutory procedure permitting a judge to allow a child sex-abuse victim to testify via one-way closed circuit television. That statute permitted such testimony if the court determined that the child's live testimony would result in the child suffering serious emotional distress such that he or she could not reasonably communicate. *Id.* The child, prosecutor, and defense counsel went to another room for the testimony, and the defendant, judge, and jury remained in the courtroom. *Id.* The child victims were allowed to testify in this manner, and the issue was taken up on appeal. *Id.* In analyzing whether such a procedure ran afoul of the Confrontation Clause, the Supreme Court of the United States held:

> The Confrontation Clause does not guarantee criminal defendants an absolute right to a face-to-face meeting with the witnesses against them at trial. The Clause's central purpose … is served by the combined effects of the elements of confrontation: physical presence, oath, cross-examination, and observation of demeanor by the trier or fact. Although face-to-face confrontation forms the core of the Clause's values, it is not an indispensable element of the confrontation right … Nonetheless, the right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the testimony's reliability is otherwise assured.

*Id.* at 836-37 (citing *Coy v. Iowa*, 487 U.S. 1012, 1021 (1988)). The Court went on to recognize that states have a compelling interest in protecting minor victims of sex crimes from further

trauma and declined to second-guess Maryland's interest in protecting the welfare of its children. *Id.* at 838. In reaching this holding, the Court determined that an evidentiary hearing must be held to determine that denial of face-to-face testimony is necessary to further an important public policy, and that the reliability of the testimony is otherwise assured. *Id.* at 850, 855.

Since *Craig*, several other cases have clarified what are and are not "important public policies." In *United States v. Yates*, 438 F.3d 1307 (11th Cir. 2006), a district court applied the *Craig* test to permit witnesses in Australia to testify by two-way video conference at trial in Montgomery, Alabama. However, the court did not hold a hearing, and relied on the United States' assertions that the Australians were unwilling to travel to the U.S. for trial, and that the important public policies were to provide the fact-finder with crucial evidence, and resolve the case expeditiously and justly. *Id.* at 1315-16. The Eleventh Circuit reversed, holding that even though the Government's presentation of crucial evidence is an important public policy, the availability of a Rule 15 deposition basically subtracts from the prosecutor's need for video conference testimony in that circumstance. *Id*. at 1316.

Regarding the option of a Rule 15 deposition, the court found no evidentiary support for a case-specific finding that the witnesses and Defendants could not be placed in the same room for the taking of pre-trial deposition testimony pursuant to Rule 15, specifically noting that the parties could have traveled to Australia. *Id*. 1317-18. The court also specifically stated the Government never advocated any special circumstance created an inability to take such a deposition or that it would have been impossible to allow Defendants to attend such a deposition. *Id.* at 1318.

In *United States v. Rosenau*, 870 F. Supp. 2d 1109, 1112 (W.D. Wash. 2012), a witness was allowed to testify remotely from Canada because that witness had been sued by the

defendant in British Columbia and a default judgement prohibited the witness from entering the United States. Further, the Canadian government would not allow the defendant to travel to the United States, and the U.S. Marshals Service would have been unable to maintain control of the defendant outside the United States. *Id*. The court also stated there was an important public policy interest in allowing the United States to try cases regarding international smuggling of narcotics, and in ensuring the national forests are not used as staging grounds to facilitate the introduction of contraband into the U.S. *Id.* Furthermore, the procedures used to take such testimony surpassed those approved in *Craig*, due to overall better technology, and a second appointed attorney to cross-examine the witness in person. *Id*. at 1113.

In *United States v. Benson*, 79 F. App'x 813, 820-21 (6th Cir. 2003), the Sixth Circuit upheld a district court's decision to allow an eighty-five-year-old victim of fraud to testify via video conference. They found sufficient evidence was presented that the witness was too ill to travel, and the procedure was also consistent with the ruling in *United States v. Gigante*, 166 F.3d. 75, 80 (2d Cir. 1999) (closed circuit television procedure preserved characteristics of in-court testimony including swearing in, full cross examination, testimony in full view of the parties and the court, and was visible to the defendant).

More recently, in *United States v. Donziger*, 2020 WL 4747532 (S.D.N.Y. Aug. 17, 2020), a district court denied a defense motion for continuance based on a variety of factors, including Covid-19. While not directly addressing the issue, that court observed:

> While the Court will not rule on the Government's motion for remote testimony before it is made, the Court notes that depending on the circumstances of the Government's witness, remote testimony may comport with the Sixth Amendment principles set forth in *Craig* and *Gigante*. At least in in some instances, allowing remote testimony may be needed to promote the strong public interest in avoiding exposing at-risk individuals to COVID-19 and minimizing further spread of the virus. And depending on the witness's situation, the health

7

> risks and travel restrictions occasioned by the ongoing pandemic may also constitute "exceptional circumstances" that would permit the use of video testimony. While no motion for video testimony has been made, suffice it to say that such a motion would not be dead on arrival.

*Id*. at *3 (citing *Craig* and *Gigante*).

These cases demonstrate the right of confrontation is not absolute, and public policy concerns regarding the health and welfare of witnesses and the impacted communities are legitimate and valid bases for authorizing remote testimony.

**3) Discussion**

In this case, there are several important public policies at issue. The first, of course, is Defendant's right to confront witnesses in a court of law. However, as demonstrated above, this important Constitutional right is not absolute and may give way to other public policy considerations such as are present here.

The prosecution of assault on tribal lands is an important public policy. Furthermore, the victim's family in this case has a right to a resolution. More than two years have passed since this assault, and the United States has agreed to five defense-driven requests for continuances. At this juncture, with all parties prepared for trial and all witnesses except EMT-I Bulow prepared to travel and testify, the victims and Defendant alike deserve to have some closure.

It is another important public policy consideration to allow trials to proceed, to protect and support the American military mission and military personnel abroad, and to leverage technology to blend the two considerations together harmoniously. The need for the witness's physical presence is diminished because he is a deployed National Guardsman. In theater, he provides life-saving medical evacuation care to injured or wounded American, Iraqi, and coalition forces. Withdrawing EMT-I Bulow for up to 25 days will severely impact the medical

8

evacuation mission for Operation Inherent Resolve. At trial, he will provide testimonial evidence of Defendant's intoxication on the night that Defendant assaulted Jane Doe with an ATV. However, EMT-I Bulow's testimony is one piece among several that the United States will rely upon for its proof. Because EMT-I Bulow is not the singular witness providing proof of an element, he is not an essential witness, and the need for his physical presence diminishes.

Another public policy consideration accrues to Defendant's benefit: it is widely accepted that live witnesses generally appear more credible than remote witnesses. Since the proposed video testimony would be from one witness testifying on behalf of the United States, the purported reduction of credibility would benefit Defendant. Considering the overwhelming public policy concerns favoring remote testimony, the United States is willing to accept the potential credibility reduction this one witness.

Another glaring public policy is the COVID-19 pandemic and the need to limit the spread of the virus. It is contrary to important public policy to have a critical military member travel from overseas, where he is already integrated with his unit and isolated from the threat of COVID, to give face-to-face testimony for thirty minutes. While under normal circumstances, his in-person testimony could more easily be arranged, the country and the world is currently dealing with the COVID-19 pandemic that has significantly impacted the way in which we travel and work.

To facilitate in-person testimony, the witness would need to travel to New Mexico from Iraq. This would entail travel from a forward-operating location to a rear air station for transport to a third-party nation, then transfer to civilian flights from overseas to the United States and then New Mexico. Per guidelines from the Center for Disease Control and the United States Government, EMT-I Bulow would also be required to have a negative COVID-19 test result no

9

more than 3 days before travel from his forward-operating location and his international travel.[2] Travel from Iraq is even more risky than the far-simpler domestic travel often at issue for witnesses in our courts because it will certainly require multiple lay-overs in multiple countries, amplifying the exposure of the witness to populations in multiple areas.

Millions of Americans have been ordered to stay at home and avoid travel and large crowds. The virus has shut down businesses, impacted the stock market, and overwhelmed the country's healthcare resources. The longer we live with this, the more evident it becomes that there is no predictable end. Some locales will see improvement, and some places will get worse. This important public policy of preventing more infections and death is a compelling reason to allow remote testimony as requested in this motion.

The United States, prior to filing this motion, explored other options. To date, it has filed and processed a request for in-person testimony. At this time, it remains to be seen whether the Department of Defense will invoke Manual for Courts Martial Rule 703(b)(1) and declare that it will not produce the witness in person due to "the likelihood of significant interference with military operational deployment, mission accomplishment, or essential training." R.C.M. 703(b)(1), Uniform Code of Military Justice (2019). Of course, the optimal outcome, also contemplated by Rule 703, would be for this Court, like a military judge, to authorize testimony via remote means "[w]ith the consent of both the accused and Government." *Id*.

Additionally, the United States does not have the option of a Rule 15 deposition because travel to Iraq for government and defense counsel is not authorized for these purposes.

---

[2] See the Center for Disease Control, International Travel During COVID-19, accessed on August 9, 2021. https://www.cdc.gov/coronavirus/2019-ncov/travelers/travel-during-covid19.html

Notwithstanding that limitation, the same public policy concerns regarding COVID-19 are present for travel for counsel as they are for the witness. A continuance is not an alternative solution because the pandemic could continue for years. As recent history has demonstrated, we could even see an increase in cases with new variants which might again shutter our courts for an indefinite period. Continuing the case until EMT-I Bulow's return and subjecting this trial to the unknowable influence of the pandemic could take years, which is untenable given that this is already two years old.

Certainly, the current situation was not anticipated by the higher courts, however they have left the option open for such a situation. If a global pandemic does not constitute an important public interest, the United States is at a loss as to what might. This Court itself, as well as other courts across the country, have closed down due to the COVID-19 pandemic. Jury trials and grand jury proceedings were halted for a period of time, and most other proceedings were done remotely, to include detention hearings which directly bear on a defendant's liberty. In fact, Congress passed a law to allow for video participation in hearings to permit the justice system to move forward safely without running afoul of rules and laws demanding live, in-person presence. The unprecedented nature of the pandemic make many of the cases discussing video testimony somewhat inapposite. There is no end in sight to this pandemic, but we cannot completely halt the criminal justice system when there are viable ways to work around the issues. To be sure, the United States is not suggesting by this motion that video testimony should be permitted for any witness who is in anyway inconvenienced by the need to testify during the pandemic. Rather, it is the specific and unique harms to witness and his specific military mission that undergird this motion.

**4) Conclusion**

For the foregoing reasons, the United States respectfully requests that this Court allow remote testimony from EMT-I Bulow in the present case.

Respectfully submitted,

FRED J. FEDERICI
Acting United States Attorney

*Electronically filed on August 9, 2021*
ALEXANDER F. FLORES
Assistant United States Attorney
P.O. Box 607
Albuquerque, New Mexico 87103
(505) 346-7274


I HEREBY CERTIFY that on August 9, 2021, I
filed the foregoing electronically through the
CM/ECF System, which caused counsel for the
defendant to be served by electronic means, as more
fully reflected on the Notice of Electronic Filing.

*/s/*
ALEXANDER F. FLORES
Assistant United States Attorney